UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| M.M., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:07-cv-01270 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| YUMA COUNTY, *et al.*, | ) | [Re: Motion at Docket 226] |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  MOTION PRESENTED

At docket 226, defendants Yuma County Jail District ("the County"), Ralph E. Ogden ("Ogden"), and Michael McGregor ("McGregor") (collectively "defendants") move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs M.M., Ashley Ingraham ("Ingraham"), and Alex Garza ("Garza") oppose the motion at docket 246.  Defendants' reply is at docket 259.  Oral argument was requested but would not assist the court.

## II.  BACKGROUND

This lawsuit arises out of the premature birth of M.M.  Ingraham is M.M.'s mother and Garza is M.M.'s father.  Ogden was the Sheriff of Yuma County. McGregor was the

commander at the Yuma County Detention Center.  Ingraham was taken into custody at the Yuma County Detention Center on September 7, 2006.

Ingraham was examined at intake by Elanor Snyder ("Snyder"), an employee of Northend Health Associates ("Northend"), which contracted to provide medical services at the jail.  She informed Snyder that she was pregnant, suffered from bipolar disorder, and was taking medication.  Ingraham was given prenatal vitamins.

The following day, at 10:39 a.m., Ingraham was examined by defendant Kindra Gonzales ("Gonzales"), Northend's Director of Nursing.  Gonzales was informed that Ingraham had an outburst at a court hearing that morning.  She was unaware whether Ingraham would be in jail for an extended period, but was told that Ingraham was pregnant, acknowledged the need for Ingraham's medical records, and ordered a vital sign check and a urinalysis to confirm the pregnancy.

Ingraham was brought back to the medical department at 10:56 a.m. after she complained that she was having contractions and needed her psychiatric medications.  Gonzales performed an abdominal exam and did not notice anything out of the ordinary.  Ingraham asked to be taken to the hospital and stated that her water broke.  Gonzales examined Ingraham's underwear and found "a small amount of yellow fluid with urine smell [and] no bloody show."[1]  Gonzales reported that it did "not appear to be amniotic fluid" and that she was "unable to test" it.[2]  Gonzales then contacted Northend's Medical

---

[1] Doc. 207-1 at 6.

[2] *Id.* at 7.

Director, Jose Piscoya ("Piscoya"). Piscoya ordered that Ingraham be given Tylenol for pain and instructed that she not be sent to the hospital at that time.

On September 9, 2006, at approximately 2 p.m., Ingraham told a detention officer that she had jumped off her bed onto her abdomen in an effort to terminate her pregnancy. Rafael Felix ("Felix") was the supervising sergeant at that time, and he was informed by the detention officer that Ingraham was attempting to harm herself. Joe Franklin ("Franklin") relieved Felix at around 2:45 p.m and was similarly informed. Franklin accompanied nurse Radu Timis ("Timis") to Ingraham's cell, and Timis examined Ingraham. Franklin told Ingraham that if her behavior continued, she might be restrained or placed on suicide watch.

Approximately an hour later, Timis reassessed Ingraham, again in Franklin's presence. Ingraham was crying, told them that she was not a good mother because she was in jail, and that she wanted to terminate her pregnancy. Ingraham requested pain medication for back, abdominal, and lower pelvic pain. Timis suggested that Ingraham give her child up for adoption and told her again that suicide watch might be necessary. Franklin told her that she could be charged with "premeditated manslaughter" if she successfully aborted her pregnancy in jail.[3]

At 5:45 p.m., Franklin was advised that Ingraham was bleeding, that an officer had observed blood in Ingraham's toilet and on a pad, and that the medical staff had been apprised of the situation. Officer Benjamin Wilson ("Wilson") went on duty sometime around 7:00 p.m. and also observed blood. Timis examined Ingraham again

---

[3] *Id.* at 11.

at 8:05 p.m.  Although he observed blood in Ingraham's toilet, he did not feel any uterine contractions.  Ingraham was placed on medical watch, bed rest, and a pad count.

Around 9:20 p.m., Ingraham claimed that her mucus plug had come out.  Ingraham was examined again by Timis, who observed a pad with a filament of mucus that Timis believed was from Ingraham's nose.  Ingraham was placed in a dry cell.[4]

Officer Donna Knolle's ("Knolle") shift began at 10:00 p.m.  Ingraham told Knolle that she was having contractions.  At approximately 10:30 p.m., Knolle and Franklin accompanied a certified nursing assistant ("CNA") to Ingraham's cell, and the CNA checked Ingraham's vital signs and felt for contractions.  Joe Kelly ("Kelly") replaced Franklin as on-duty sergeant at some point subsequent to that check-up.  At approximately 10:45 p.m., nurse Irene Naputi ("Naputi") performed a pad count and did not observe any mucus.  When Kelly went on duty, he heard Ingraham yelling from her cell.  Ingraham told Kelly she was in labor and in pain.  Kelly told Ingraham that he would inform the medical staff.  Kelly contacted Naputi who sent the CNA to check Ingraham's vital signs at 12:31 a.m. on September 10.

At around 1:00 a.m. on September 10, 2006 Ingraham gave birth to M.M. in her cell.  Knolle reported seeing Ingraham holding a baby at 1:10 a.m. and emergency medical personnel was on site by 1:15 a.m.

Ingraham and Garza, individually and on behalf of M.M., filed a lawsuit against the County, Felix, Kelly, Franklin, Wilson, Knolle, McGregor, Ogden, and various

---

[4] A dry cell is a cell in which an inmate cannot flush the toilet unless prison administrators turn on the water.  Doc. 262-1 at 6.

employees of Northend. Plaintiffs' complaint alleges that all defendants deprived them of their civil rights in violation of 42 U.S.C. § 1983 and that all defendants were negligent.

## III. STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."[5] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[6] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[8] The reviewing court may not weigh evidence or assess the credibility of witnesses.[9] The burden of persuasion is on the moving party.[10]

## IV. DISCUSSION

### A. Vicarious Liability

Defendants argue first that none of them can be held vicariously liable under 42 U.S.C. § 1983 for the actions of their subordinates. Defendants are correct–"vicarious

---

[5] Fed. R. Civ. P. 56(a).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7] *Id.*

[8] *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[9] *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

liability is inapplicable to § 1983 suits" and "absent vicarious liability, each [g]overnment official is only liable for his or her own misconduct."[11]  Plaintiffs have not alleged any direct misconduct by Ogden or McGregor relating to M.M.'s birth.

## B. Failure to Train

Even though the County may not be held vicariously liable for the actions of its employees, "liability can attach if the [County] caused a constitutional violation through official policy or custom, even if the constitutional violation occurs only once."[12] Defendants argue that plaintiffs have not presented any evidence that a policy or custom of the County caused any deprivation of constitutional rights.[13]  Plaintiffs respond that the County is liable under § 1983 for failing to train its employees.

The "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."[14]  "Only where a failure to train reflects a . . . conscious choice by a municipality–a policy as defined [in the case law]–can a municipality be liable for such a failure under § 1983."[15]

Plaintiffs argue that the County had a policy whereby on-duty sergeants could overrule the medical staff, yet the sergeants were untrained in medical or mental health

---

[11]*Ammons v. Wash. Dep't of Soc. & Health Svcs.*, 648 F.3d 1020, 1037 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948–49 (2009)).

[12]*Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008).

[13]*See Monell v. N.Y. City Dep't of Soc. Svcs.*, 436 U.S. 658, 695–96 (1978).

[14]*City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

[15]*Id.* at 389 (internal quotations omitted).

issues.  "In resolving the issue of a [county's] liability, the focus must be on adequacy of the training program *in relation to the tasks the particular officers must perform*."[16]  The problem with plaintiffs' argument is that detention officers and sergeants were not tasked with performing medical evaluations.  Those responsibilities belonged to the medical staff.  The County's policy was to hire independent medical personnel.  That is not inconsistent with the on-duty sergeants' authority to override the medical staff.  There are any number of administrative, non-medical reasons why jail supervisors might have that authority.  Because the detention officers and sergeants were not charged with performing medical assessments–plaintiffs' § 1983 claim against the County fails.

## C.  Supervisory Liability

A supervisor may be individually liable under § 1983 "if there exists either: (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."[17]  Personal participation of a supervisor may be shown if the supervisor "acted, or failed to act, in a manner that was deliberately indifferent."[18]  Defendants argue that plaintiffs have not demonstrated that either Ogden or McGregor had personal involvement in the alleged constitutional deprivation or that their conduct had any causal connection to the alleged constitutional violation.

---

[16] *Id.* at 390 (emphasis added).

[17] *Jefers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).

[18] *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011).

Plaintiffs argue that "Ogden and McGregor failed to adequately train their sergeant supervisors as necessary to provide adequate health care to inmates."[19] An official is deliberately indifferent if he is "aware of facts from which the inference could be drawn that a substantial risk of [a rights violation] exists, and he must also draw the inference."[20] Here, plaintiffs have not shown that Ogden or McGregor would have been aware that a substantial risk of an Eighth Amendment violation existed–the jail contracted with Northend for medical services. Even if the act of hiring a medical services provider could support an inference that a substantial risk of inadequate care existed, there is no evidence that Ogden or McGregor drew that inference. Consequently, neither Ogden nor McGregor is liable under § 1983.

**D. Qualified Immunity**

Ogden and McGregor argue that they are entitled to qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[21] Qualified immunity is immunity from having to defend a lawsuit, not just a defense to liability.[22] The Supreme Court has accordingly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[23]

---

[19] Doc. 246 at 12.

[20] *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010).

[21] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).

[22] *Id.* (internal quotations omitted).

[23] *Id.* at 232 (internal quotations omitted).

In *Saucier v. Katz*,[24] the Supreme Court mandated a two-part test to determine whether an official was entitled to qualified immunity. At the summary judgment stage, "a court must decide whether the facts that [the] plaintiff has . . . shown . . . make out a violation of a constitutional right."[25] If so, "the court must decide whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct."[26] In *Pearson v. Callahan*, the Supreme Court determined that "while the sequence set forth [in *Saucier*] is often appropriate . . . district courts and . . . courts of appeals should be permitted to exercise their . . . discretion in deciding which of the two prongs . . . should be addressed first."[27]

Here, plaintiffs have not presented any evidence that Ogden or McGregor violated a constitutional right. Plaintiffs maintain that a determination as to whether Ogden or McGregor are entitled to qualified immunity should be reserved until disputed facts regarding whether Ogden and McGregor adequately trained their subordinates are resolved. However, as discussed above, plaintiffs have not shown that Ogden and McGregor were deliberately indifferent to plaintiffs' constitutional rights. No additional disputes of fact need to be resolved. Ogden and McGregor are entitled to qualified immunity.

---

[24]533 U.S. 194, 201 (2001).

[25]*Id.*

[26]*Pearson*, 555 U.S. at 232.

[27]*Id.* at 236.

## V.  CONCLUSION

For the reasons above, defendants' motion at docket 226, for summary judgment pursuant to Rule 56 is **GRANTED**.  The claims against the County, Ogden, and McGregor are **DISMISSED**.

DATED this 22nd day of November 2011.

>                     /s/
>            JOHN W. SEDWICK
>      UNITED STATES DISTRICT JUDGE