UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| M.M., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | 2:07-cv-01270 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| YUMA COUNTY, *et al.*, | ) | [Re: Motion at Docket 225] |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  MOTION PRESENTED

At docket 225, defendants Rafael Felix ("Felix"), Robert Kelly ("Kelly"), Joe Franklin ("Franklin"), Benjamin Wilson ("Wilson"), and Donna Knolle ("Knolle") (collectively "defendants"), move pursuant to Federal Rule of Civil Procedure 56 for summary judgment.  Plaintiffs M.M., Ashley Ingraham ("Ingraham"), and Alex Garza ("Garza") (collectively "plaintiffs") respond to the motion at docket 248.  Plaintiffs do not oppose the motion with respect to Felix, Wilson, or Knolle, but do oppose the motion with respect to Kelly and Franklin.  Defendants' reply is at docket 258.  Oral argument was requested but would not assist the court.

## II.  BACKGROUND

This lawsuit arises out of the premature birth of M.M.  Ingraham is M.M.'s mother and Garza is M.M.'s father.  Felix, Kelly, and Franklin are sergeants at the Yuma County Detention Center.  Wilson and Knolle are detention officers.  Ingraham was taken into custody at the Yuma County Detention Center on September 7, 2006.  She was put in the Blue Unit for higher risk inmates.

Ingraham was examined at intake by Elanor Snyder ("Snyder"), an employee of Northend Health Associates ("Northend"), which contracted to provide medical services at the jail.  She informed Snyder that she was pregnant, suffered from bipolar disorder, and was taking medication.  Ingraham was given prenatal vitamins.

The following day, at 10:39 a.m., Ingraham was examined by defendant Kindra Gonzales ("Gonzales"), Northend's Director of Nursing.  Gonzales was informed that Ingraham had an outburst at a court hearing that morning.  She was unaware whether Ingraham would be in jail for an extended period, but was told that Ingraham was pregnant, acknowledged the need for Ingraham's medical records, and ordered a vital sign check and a urinalysis to confirm the pregnancy.

Ingraham was brought back to the medical department at 10:56 a.m. after she complained that she was having contractions and needed her psychiatric medications. Gonzales performed an abdominal exam and did not notice anything out of the ordinary. Ingraham asked to be taken to the hospital and stated that her water broke.  Gonzales examined Ingraham's underwear and found "a small amount of yellow fluid with urine

smell [and] no bloody show."[1]  Gonzales reported that it did "not appear to be amniotic fluid" and that she was "unable to test" it.[2]  Gonzales then contacted Northend's Medical Director, Jose Piscoya ("Piscoya").  Piscoya ordered that Ingraham be given Tylenol for pain and instructed that she not be sent to the hospital at that time.

On September 9, 2006, at approximately 2 p.m., Ingraham told a detention officer that she had jumped off her bed onto her abdomen in an effort to terminate her pregnancy.  Felix was the supervising sergeant at that time, and he was informed by the detention officer that Ingraham was attempting to harm herself.  Franklin came on duty at approximately 2:45 p.m and was similarly informed.  Franklin accompanied nurse Radu Timis ("Timis") to Ingraham's cell, and Timis examined Ingraham.  Franklin told Ingraham that if her behavior continued, she might be restrained or placed on suicide watch.

Approximately an hour later, Timis reassessed Ingraham, again in Franklin's presence.  Ingraham was crying, told them that she was not a good mother because she was in jail, and that she wanted to terminate her pregnancy.  Ingraham requested pain medication for back, abdominal, and lower pelvic pain.  Timis suggested that Ingraham give her child up for adoption and told her again that suicide watch might be necessary.  Franklin told her that she could be charged with "premeditated manslaughter" if she successfully aborted her pregnancy in jail.[3]

---

[1]Doc. 207-1 at 6.

[2]*Id.* at 7.

[3]*Id.* at 11.

At 5:45 p.m., Franklin was advised that Ingraham was bleeding, that an officer had observed blood in Ingraham's toilet and on a pad, and that the medical staff had been apprised of the situation.  Wilson went on duty sometime around 7:00 p.m. and also observed blood.  Timis examined Ingraham again at 8:05 p.m.  Although he observed blood in Ingraham's toilet, he did not feel any uterine contractions.  Ingraham was placed on medical watch, bed rest, and a pad count.  Franklin maintains that–at some point during his shift–he asked Timis whether Ingraham was in labor, and Timis responded that she was not.[4]

Around 9:20 p.m., Ingraham claimed that her mucus plug had come out. Ingraham was examined again by Timis, who observed a pad with a filament of mucus that Timis believed was from Ingraham's nose.  Ingraham was placed in a dry cell.[5]

Knolle's shift began at 10:00 p.m.  Ingraham told Knolle that she was having contractions.  At approximately 10:30 p.m., Knolle and Franklin accompanied a certified nursing assistant ("CNA") to Ingraham's cell, and the CNA checked Ingraham's vital signs and felt for contractions.  Kelly replaced Franklin as on-duty sergeant at some point subsequent to that check-up.  At approximately 10:45 p.m., nurse Irene Naputi performed a pad count and did not observe any mucus.  When Kelly went on duty, he heard Ingraham yelling from her cell.  Ingraham told Kelly she was in labor and in pain.

---

[4]Doc. 227-2 at 72.

[5]A dry cell is a cell in which an inmate cannot flush the toilet unless prison administrators turn on the water.  Doc. 262-1 at 6.   Although some evidence indicates that Timis ordered the dry cell, Franklin stated that he "put her on dry cell" because Timis "put her on pad count." *Compare* doc. 224-1 at 29 *with* 262-1 at 6.

Kelly told Ingraham that he would inform the medical staff.  Kelly contacted Naputi who sent the CNA to check Ingraham's vital signs at 12:31 a.m. on September 10.

At around 1:00 a.m. on September 10, 2006, Ingraham gave birth to M.M. in her cell.  Knolle reported seeing Ingraham holding a baby at 1:10 a.m. and emergency medical personnel was on site by 1:15 a.m.

Ingraham and Garza, individually and on behalf of M.M., filed a lawsuit against the Yuma County Jail District, Felix, Kelly, Franklin, Wilson, and Knolle, other county officials and various employees of Northend.  Plaintiffs' complaint alleges that all defendants deprived them of their civil rights in violation of 42 U.S.C. § 1983 and that all defendants were negligent.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."[6]  The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[7]  Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[8]  In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the

---

[6]Fed. R. Civ. P. 56(a).

[7]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8]*Id.*

non-moving party.[9]  The reviewing court may not weigh evidence or assess the
credibility of witnesses.[10]  The burden of persuasion is on the moving party.[11]

## IV.  DISCUSSION

Because plaintiffs do not oppose the motion as it pertains to Felix, Wilson, or
Knolle, the court need only consider the merits of defendants' arguments concerning
Franklin and Kelly.  Defendants argue that plaintiffs have not shown that Franklin or
Kelly were deliberately indifferent to any serious medical need, that even if they were,
they are entitled to qualified immunity.  Because defendants' entitlement to qualified
immunity hinges in part on whether plaintiffs have shown a constitutional violation, the
court will first consider defendants' arguments with respect to plaintiffs' § 1983 claim.

### A. Deliberate Indifference

In order to prevail on their § 1983 claims, plaintiffs must demonstrate that
Franklin and Kelly acted with "deliberate indifference to [Ingraham's] serious medical
needs."[12]  Negligence does not necessarily constitute deliberate indifference.[13]
Deliberate indifference requires subjective awareness of a serious medical need and a
failure to adequately respond to that need.[14]  Defendants' overarching argument is that
Franklin and Kelly were responsive to Ingraham's complaints–"every time Ingraham

---

[9]*Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[10]*Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[11]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12]*Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

[13]*Id.* at 106.

[14]*Simmons v. Navajo County*, 609 F.3d 1011, 1017–18 (9th Cir. 2010).

complained of a medical condition the detention staff informed the medical staff of the problem."[15]  The court will consider the evidence in context of each defendant.

### 1. Sergeant Franklin

Defendants argue that Franklin accompanied Timis to Ingraham's examination after learning that Ingraham had jumped or fallen on her abdomen.  Defendants also argue that Timis told Franklin that Ingraham was not in labor and did not need to go to the hospital, and Franklin relied on those representations.  The problem with defendants' arguments is that deliberate indifference is not limited to a wholesale failure to respond, but may involve a failure to *adequately* respond.[16]

Whether Franklin was aware of Ingraham's precise diagnoses is immaterial.[17] He was aware of reports that she was jumping or falling onto her abdomen in order to trigger a miscarriage.[18]  That awareness is demonstrated by his statements to Ingraham that restraints[19] or suicide watch may be necessary and by his later statement to Ingraham that she might be charged with a crime if she successfully terminated her pregnancy while in jail.[20]  Franklin was also aware that Ingraham was experiencing

---

[15]Doc. 225 at 8.

[16]*See Simmons*, 609 F.3d at 1018; *see also Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988) (Deliberate indifference "may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.").

[17]*See* doc. 227-2 at 72.

[18]Doc. 224-1 at 22.

[19]*Id.* at 17.

[20]*Id.* at 27.

vaginal bleeding.[21]  He was also aware of Ingraham's complaints that she was in serious pain.  Franklin knew that Ingraham claimed she was having contractions.[22] Even if Franklin did not subjectively believe Ingraham *to be* in labor–based on his reliance on Timis or otherwise–he had enough information to potentially conclude that Ingraham should be hospitalized or that some other action should be taken.  Franklin's stated reliance on Timis's purported expertise is not dispositive because Franklin had the authority as supervising sergeant to override the medical staff.[23]  A reasonable jury could therefore conclude that Franklin's various responses were inadequate.

### 2. Sergeant Kelly

Defendants maintain that Kelly was "attentive to plaintiff Ingraham's complaints on several occasions during his shift."[24]  Franklin briefed Kelly regarding Ingraham at the outset of his shift.[25]  Kelly was under the impression–regardless of whether Ingraham actually did intentionally jump or fall on her belly–that Ingraham had been attempting to trigger a miscarriage.[26]  He heard Ingraham yelling when he came on duty, and Ingraham told him that she was in labor.[27]  Kelly was also aware that

---

[21]Doc. 227-1 at 22.

[22]*Id.* at 27–28.

[23]*Id.* at 72.

[24]Doc. 225 at 10.

[25]Doc. 247-10 at 2.

[26]*Id.*

[27]*Id.*

Ingraham had been complaining that she was in labor for the duration of Knolle's shift.[28]

Kelly knew that Ingraham was bleeding, though he claims he was under the impression

that the bleeding was insubstantial.[29]  Kelly responded by informing Naputi of

Ingraham's complaints, and Kelly relied on Naputi's assessment that Ingraham was fine.

Kelly also accompanied the CNA who checked Ingraham's vital signs, and instructed

Knolle to monitor Ingraham's behavior.[30]  However, as plaintiffs point out, Kelly did not

have any indication that Naputi ever examined Ingraham.  Because Kelly had the same

information available to him that Franklin did, a reasonable jury could conclude that his

response was inadequate.

**B. Qualified Immunity**

Qualified immunity "protects government officials from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."[31]  Qualified immunity is

immunity from having to defend a lawsuit, not just a defense to liability.[32]  The Supreme

Court has accordingly "stressed the importance of resolving immunity questions at the

earliest possible stage in litigation."[33]

---

[28]*Id.*

[29]Doc. 227-2 at 105.

[30]*See* doc. 247-10 at 2.

[31]*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted).

[32]*Id.* (internal quotations omitted).

[33]*Id.* at 232 (internal quotations omitted).

In *Saucier v. Katz*,[34] the Supreme Court mandated a two-part test to determine whether an official was entitled to qualified immunity.  At the summary judgment stage, "a court must decide whether the facts that [the] plaintiff has . . . shown . . . make out a violation of a constitutional right."[35]  If so, "the court must decide whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct."[36]  In *Pearson v. Callahan*, the Supreme Court determined that "while the sequence set forth [in *Saucier*] is often appropriate . . . district courts and . . . courts of appeals should be permitted to exercise their . . . discretion in deciding which of the two prongs . . . should be addressed first."[37]

Defendants' only developed argument is that plaintiffs failed to demonstrate violation of a constitutional right.  That argument fails for the reasons discussed above–a  jury could conclude that Franklin and Kelly were deliberately indifferent to Ingraham's serious medical needs based on inferences drawn from the information known to them.

The only argument that defendants did not violate a clearly established right is a one-sentence assertion that plaintiffs have not met their burden to show a clearly

---

[34]533 U.S. 194, 201 (2001).

[35]*Id.*

[36]*Pearson*, 555 U.S. at 232.

[37]*Id.* at 236.

established right,[38] citing *Sweaney v. ADA County, Idaho*[39] and *Trevino v. Gates*.[40]

Defendants are correct that the burden Is on plaintiffs to show the right was clearly

established.  However, *Sweaney* is of no avail.  There, the issue was whether a parent

has a clearly established constitutional "right to inflict corporal punishment upon a

child."[41]  *Trevino* is also inapposite.  There, defendants were city council members who

had voted to pay punitive damages.  Trevino's theory of liability was that by doing so

they had condoned and encouraged police brutality.  Not surprisingly, the Ninth Circuit

wrote "the law is not sufficiently clear that a reasonable Council member would

understand that payment of punitive damages violates any constitutional right."[42]  Here,

the question is whether correctional officers would have known that an incarcerated

person has a clearly established right not to be denied care for a serious medical need

by virtue of the officers' deliberate indifference to the plight of the inmate.  The law on

this point is well-established.  Consequently, defendants' qualified immunity argument

fails.

## C.  Negligence Claims

Defendants argue that plaintiffs have not presented any evidence that Franklin or

Kelly's conduct "create[d] an unreasonable risk of bodily harm to others [and] involve[d]

---

[38]Doc. 225 at 10.  Defendants also incorporate by reference the qualified immunity arguments made by co-defendants Ogden and McGregor at doc. 226, 9-10.  A review of those arguments discloses nothing to support defendants' position here.

[39]119 F.3d 1385 (9th Cir. 1997).

[40]99 F.3d 911 (9th Cir. 1996).

[41]*Sweaney*, 119 F. 3d at 1389.

[42]*Trevino*, 99 F.3d at 917.

a high probability that substantial harm w[ould] result."[43]  The court need not determine whether any evidence offered by plaintiffs suggests that Franklin or Kelly behaved wantonly.  Even though plaintiffs' complaint recites a claim under the heading "Negligence and/or Gross Negligence," it is clear from the body of that claim that it is one for simple negligence.[44]  In their reply brief defendants argue that they are entitled to summary judgment on plaintiffs' negligence claim because "at every juncture [they] obtained medical care for . . . Ingraham when they were made aware of her [complaints]."[45]  They argue that Franklin and Kelly's only duty "was to notify medical staff."[46]  Franklin and Kelly had a duty to act reasonably under the circumstances. Whether they discharged that duty with respect to Ingraham is a jury question.

**D.  Punitive Damages**

Defendants claim that they are not liable for punitive damages.  Plaintiffs do not oppose this aspect of defendants' motion.[47]

<h2 style="text-align:center"><u>V.  CONCLUSION</u></h2>

For the reasons above, defendants' motion at docket 225 for summary judgment pursuant to Rule 56 is **GRANTED** in part and **DENIED** in part as follows:

---

[43]*Walls v. Ariz. Dep't of Pub. Safety,* 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991).

[44]*See* Doc. 272 ¶¶ 74–81.

[45]Doc. 258 at 7.

[46]*Id.* at 7.

[47]Doc. 248 at 17.

1) It is granted as to defendants Felix, Wilson, and Knolle.  All claims against those defendants are **DISMISSED**.

2) It is granted with respect to plaintiffs' punitive damages claims against defendants Franklin and Kelly.  Those claims are **DISMISSED.**

3) It is denied as to the § 1983 and simple negligence claims against defendants Franklin and Kelly.

DATED this 22nd day of November 2011.


_____/s/_____
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE