UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| M.M., *et al.*, | |
| Plaintiffs, | 2:07-cv-01270 JWS |
| vs. | ORDER AND OPINION |
| YUMA COUNTY, *et al.*, | [Re: Motion at Docket 231] |
| Defendants. | |

## I.  MOTION PRESENTED

At docket 231, defendant Steve Linde ("Linde") moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiffs M.M., Ashley Ingraham ("Ingraham"), and Alex Garza ("Garza") (collectively "plaintiffs") oppose the motion at docket 251.  Defendants Yuma County Jail District, Ralph Ogden ("Ogden"), Michael McGregor ("McGregor"), Robert Kelly ("Kelly"), Joe Franklin ("Franklin"), Rafael Felix ("Felix"), Benjamin Wilson ("Wilson"), and Donna Knolle ("Knolle") (collectively "Yuma County defendants") respond to the motion at docket 253.  Linde replies at dockets 265 and 266.  Oral argument was requested, but would not assist the court.

## II.  BACKGROUND

This lawsuit arises out of the premature birth of M.M.  Ingraham is M.M.'s mother and Garza is M.M,'s father.  Linde is a physician's assistant and the proprietor of

Northend Health Associates ("Northend").  Northend contracted to provide medical services at the Yuma County Detention Center.

Inghraham was taken into custody at the Yuma County Detention Center on September 7, 2006.  She was examined at intake by Elanor Snyder ("Snyder"), an employee of Northend.  She informed Snyder that she was pregnant, suffered from bipolar disorder, and was taking medication.  Ingraham was given prenatal vitamins.

The following day, at 10:39 a.m., Ingraham was examined by defendant Kindra Gonzales ("Gonzales"), Northend's Director of Nursing.  Gonzales was informed that Ingraham had an outburst at a court hearing that morning.  She was unaware whether Ingraham would be in jail for an extended period, but was told that Ingraham was pregnant, acknowledged the need for Ingraham's medical records, and ordered a vital sign check and a urinalysis to confirm the pregnancy.

Ingraham was brought back to the medical department at 10:56 a.m. after she complained that she was having contractions and needed her psychiatric medications.  Gonzales performed an abdominal exam and did not notice anything out of the ordinary.  Ingraham asked to be taken to the hospital and stated that her water broke.  Gonzales examined Ingraham's underwear and found "a small amount of yellow fluid with urine smell [and] no bloody show."[1]  Gonzales reported that it did "not appear to be amniotic fluid" and that she was "unable to test" it.[2]  Gonzales then contacted Northend's Medical Director, Jose Piscoya ("Piscoya").  Piscoya ordered that Ingraham be given Tylenol for pain and instructed that she not be sent to the hospital at that time.

---

[1] Doc. 207-1 at 6.

[2] *Id.* at 7.

On September 9, 2006, at approximately 2:00 p.m., Ingraham told a detention officer that she had jumped off her bed and onto her abdomen in an effort to terminate her pregnancy. Rafael Felix ("Felix") was the supervising sergeant at that time, and he was informed by the detention officer that Ingraham was attempting to harm herself. Joe Franklin ("Franklin") relieved Felix at around 2:45 p.m and was similarly informed. Franklin accompanied nurse Radu Timis ("Timis") to Ingraham's cell, and Timis examined Ingraham. Franklin told Ingraham that if her behavior continued, she might be restrained or placed on suicide watch.

Approximately an hour later, Timis reassessed Ingraham, again in Franklin's presence. Ingraham was crying, told them that she was not a good mother because she was in jail, and that she wanted to terminate her pregnancy. Ingraham requested pain medication for back, abdominal, and lower pelvic pain. Timis suggested that Ingraham give her child up for adoption and told her again that suicide watch might be necessary. Franklin told her that she could be charged with "premeditated manslaughter" if she successfully aborted her pregnancy in jail.[3]

At 5:45 p.m., Franklin was advised that Ingraham was bleeding, that an officer had observed blood in Ingraham's toilet and on a pad, and that the medical staff had been apprised of the situation. Officer Benjamin Wilson ("Wilson") went on duty sometime around 7:00 p.m. and also observed blood. Timis examined Ingraham again at 8:05 p.m. Although he observed blood in Ingraham's toilet, he did not feel any uterine contractions. Ingraham was placed on medical watch, bed rest, and a pad count.

---

[3] *Id.* at 11.

Around 9:20 p.m., Ingraham claimed that her mucus plug had come out. Ingraham was examined again by Timis, who observed a pad with a filament of mucus that Timis believed was from Ingraham's nose. Ingraham was placed in a dry cell.[4]

Officer Donna Knolle's ("Knolle") shift began at 10:00 p.m. Ingraham told Knolle that she was having contractions. At approximately 10:30 p.m., Knolle and Franklin accompanied a certified nursing assistant ("CNA") to Ingraham's cell, and the CNA checked Ingraham's vital signs and felt for contractions. Joe Kelly ("Kelly") replaced Franklin as on-duty sergeant at some point subsequent to that check-up. At approximately 10:45 p.m., nurse Irene Naputi ("Naputi") performed a pad count and did not observe any mucus. When Kelly went on duty, he heard Ingraham yelling from her cell. Ingraham told Kelly she was in labor and in pain. Kelly told Ingraham that he would inform the medical staff. Kelly contacted Naputi who sent the CNA to check Ingraham's vital signs at 12:31 a.m. on September 10.

At around 1:00 a.m. on September 10, 2006, Ingraham gave birth to M.M. in her cell. Knolle reported seeing Ingraham holding a baby at 1:10 a.m. and emergency medical personnel was on site by 1:15 a.m.

Ingraham and Garza, individually and on behalf of M.M., filed a lawsuit against Linde, Piscoya, Gonzales, Timis, and Naputi, and numerous jail employees. Plaintiffs' complaint alleges that all defendants deprived them of their civil rights in violation of 42 U.S.C. § 1983 and that all defendants were negligent.

---

[4] A dry cell is a cell in which an inmate cannot flush the toilet unless prison administrators turn on the water. Doc. 262-1 at 6.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law."[5] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[6] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7] In resolving a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.[8] The reviewing court may not weigh evidence or assess the credibility of witnesses.[9] The burden of persuasion is on the moving party.[10]

### IV.  DISCUSSION

Linde advances two arguments in support of his motion.  First, Linde argues that plaintiffs have not adequately supported their § 1983 claim against him based on his alleged failure to adequately train Northend employees.  Second, Linde argues that plaintiffs will be unable to make out a direct negligence claim against him because their expert is not qualified to testify regarding breach.

---

[5] Fed. R. Civ. P. 56(a).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[7] *Id.*

[8] *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000).

[9] *Dominguez-Curry v. Nevada Transp. Dept.*, 424 F.3d 1027, 1036 (9th Cir. 2005).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Yuma County defendants maintain that Linde's motion should be denied because plaintiffs' § 1983 claim could be based on Linde's alleged failure to ensure that Nitrazine strips, a fetal monitor, or an ultrasonic stethoscope were available at the jail.

**A. § 1983 Claim**

    **1. Failure to Train**

A supervisor may be liable under § 1983 for a failure to train his or her subordinates if the failure amounts to deliberate indifference towards the rights of individuals with whom the subordinates are likely to come in contact.[11] A plaintiff must demonstrate that the training was inadequate, that the inadequacy was a deliberate or conscious choice on the part of the individual defendant, and that the inadequate training deprived the plaintiff of a constitutional right.[12] Plaintiffs here argue that Linde is liable under § 1983 for failing to adequately train Northend employees.

Linde emphasizes that the Supreme Court has noted that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train,"[13] and argues that no pattern has been shown.

Plaintiffs' expert, Dr. Robert Greifinger ("Greifinger") testified that the Northend employees' "training was inadequate because the practices were inadequate."[14] Greifinger then conceded that there might be other explanations for the response in this

---

[11] *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998).

[12] *Id.* at 1214.

[13] *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011) (internal quotations omitted).

[14] Doc. 252-5 at 2.

instance such as a "lack of supervision" and "systemic . . . disbelief of patients like . . . Ingraham."[15]  Even if Greifinger's equivocal testimony were sufficient to establish that Northend's medical staff was inadequately trained, plaintiffs have not presented any evidence that the inadequate training was the product of a deliberate choice by Linde. Plaintiffs have therefore not presented evidence sufficient to support a claim under § 1983 based on a failure to train Northend employees.

**2. Supervisor Liability**

A supervisor may be individually liable under § 1983 "if there exists either: (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."[16] Personal participation of a supervisor may be shown if the supervisor "acted, or failed to act, in a manner that was deliberately indifferent."[17]  An individual is deliberately indifferent if he is "aware of facts from which the inference could be drawn that a substantial risk of [a rights violation] exists, and he must also draw the inference."[18]

Linde argued initially that summary judgment was appropriate on plaintiffs' § 1983 claim because there was no evidence that Linde had any personal involvement with Ingraham.[19]  However, Timis filed an affidavit in which he asserted that he called Linde after his first meeting with Ingraham and informed him of his assessment and of

---

[15]*Id.*

[16]*Jefers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).

[17]*Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011).

[18]*Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010).

[19]Doc. 231 at 3.

the reports that Ingraham was attempting to trigger a miscarriage, among other things.[20] If that conversation occurred–Linde has no recollection of it–then a reasonable jury could potentially conclude that Linde was aware of facts giving rise to a substantial risk of a rights violation, that his response was inadequate, and therefore that Linde acted with deliberate indifference.

**B. Negligence Claim**

Linde argues that plaintiffs are unable to prove breach because their expert is unqualified to testify. In Arizona, "[i]n order for a plaintiff to establish the statutory elements to maintain a malpractice claim, he must normally utilize medical testimony by qualified physicians."[21] Expert medical testimony must be used unless "the negligence is so grossly apparent that a layman would have no difficulty in recognizing it."[22] Under Arizona Revised Statute § 12-2604,

> [i]n an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of . . . care unless the person is licensed as a health professional . . . and . . . [d]uring the year immediately preceding the occurrence giving rise to the lawsuit, devoted a majority of the person's professional time to either . . . (a) [t]he active clinical practice of the same health profession as the defendant . . . [or] (b) [t]he instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession as the defendant.[23]

The statute is substantive, not procedural.[24]

---

[20] Doc. 267-1 at 3.

[21] *Peacock v. Samaritan Health Svc.*, 765 P.2d 525, 528 (Ariz. Ct. App. 1988).

[22] *Id.* (internal quotations omitted).

[23] A.R.S. § 12-2604(A)(2).

[24] *Seisinger v. Siebel*, 203 P.3d 483, 493–94 (Ariz. 2009).

Greifinger is not a licensed physician's assistant and therefore is not qualified to testify as to the appropriate standard of care in a medical malpractice claim against Linde as a treating physician's assistant. However, to the extent plaintiffs' negligence claim is not based on medical malpractice, § 12-2604 is not fatal, and summary judgment is inappropriate.

## V.  CONCLUSION

For the reasons above, Linde's motion at docket 231 for summary judgment pursuant to Rule 56 is **GRANTED** in part and **DENIED** in part as follows:

1) It is granted with respect to plaintiffs' claim under 42 U.S.C. § 1983 based on an alleged failure to adequately train Northend employees. It is denied with respect to a claim under that section arising out of Linde's personal participation in the events giving rise to this lawsuit.

2) It is granted as to a medical malpractice claim against Linde as a treating physician's assistant, but denied as to other negligence claims against Linde.

DATED this 29th day of November 2011.

                                             /s/
                                    JOHN W. SEDWICK
                           UNITED STATES DISTRICT JUDGE